Even assuming the government's version of the facts, the deputy's stop of Mr. Pennington was unlawful for lack of reasonable suspicion or a probable cause. Mr. Pennington was subjected to a Fourth Amendment seizure when two armed, fully uniformed sheriff's deputies stopped their marked patrol car in his path in such close proximity to him that he was readily able to put his hands on the hood even after they knew that he had a gun. Is that really the government's version of that? Is that what Deputy Miller said about where he stopped the car? What Deputy Miller said was, I quote, I pulled over the car. Yeah. Then Deputy Miller said, he said in his declaration that after he saw that Mr. Pennington had a gun, he said, I directed him to walk to the patrol car and put his hands on the hood. But then in his testimony at the hearing, he said simply, I told him to put his hands on the hood. And I think that's telling, Your Honors, because proximity, how close they were to Mr. Pennington is an important factor. I'm trying to figure out where he stopped the car. Well, we don't have testimony about how many feet away it was. That wasn't in the. I thought it said six or seven feet. What the testimony about feet was that, as I understand it, Your Honor, after the deputies saw that Mr. Pennington had a gun, they said, put your hands on the hood. He did. Deputy Anaya then walks to him and begins and then takes the gun from him. And at that point, I believe is when Miller said I was about, I think he said 12 feet, because what he said was, though, I was standing on the outside of my door. So the deputies had opened the doors of the patrol car, were standing outside the doors. And then Mr. Pennington is on the hood. And so Deputy Miller's testimony, I could locate it in the record. But I believe that that is the only testimony he gives about feet, like a feet distance. But I do think it's telling here that what we do have is the fact that these officers knew that he had a gun. And at that point, rather than walking to him, they were able to tell him simply to put his own hands on the patrol car's hood. Well, wait a minute, wait a minute, wait a minute, back up, OK? Because we're trying to figure out the stop. I keep trying to figure out where did the stop occur. And the district court doesn't really make that finding. And you started by saying if we assume Deputy Miller's testimony is true, assume the state's version of it, then then in that case, Mr. Pennington was in the middle of the road. Right. And so your position was that the car pulled up in proximity to him, not over to her, but right in the middle of the road and blocked his path is what you've got in your briefing. We know that it blocked his path. That is that's your view. Yes. OK, but but is that consistent with the state's view? It is consistent with the state's view. He says, I pulled my car over and Mr. Pennington was at that moment visibly startled and very unsettled. And it's the pulling over that I'm I don't mean to, but it is kind of microscopic because Deputy Miller says that Mr. Pennington was in the middle of the road. And and Deputy Miller says he pulled over at one point, another place. He says he pulled up. I'm trying to figure out where the car is vis-a-vis so because I think your argument is that the car stopped. Pennington, I think that's correct. And I think that's that is what Deputy Miller testified to. We don't know if he pulled over all the way to the curb. What are your what are your record sites that you want me to go back and look at again to support the notion that the car is what effectuated the stop? Please. I think one place that your honor can look is in the government's answering brief. No, no, no, no. Record the record. OK, well, let me look at Deputy Miller's declaration, which was actually his direct testimony here. Where is that in the record? That's at ER 182 through 184. It said in 183 line 16, I pulled over the patrol car to make contact with the person walking in the street who was later identified as Pennington. As the patrol car came to a stop, Deputy and I and I got out of the vehicle and Pennington appeared startled and caught off guard by our. Is it your position that that is when the stop occurred? It is, your honor. And I think that here we're not making this on a totally blank slate. The standard of review is de novo, but it's not a normal de novo type of review. As this court is repeatedly recognized in the Washington and the Kim cases that the government cited, this is this the facts that Deputy Miller testified to are what they are. But the district court was not ignorant of this question. The district court identified the issue as ER 6. Did Deputy Miller see a gun on Pennington's person before the officers stopped him? And it answered that question. No. On ER 7, in its conclusion, it said the court finds the initial stop was based on reasonable suspicion of a traffic violation. The sighting of the gun on his person thereafter provided a basis for the first. And that's not the only place the district court made this statement. There are at least four other places. And during the hearing with the court said, if there wasn't a traffic violation, there's no reason to have stopped him. ER 67 to 68, 73, 74 to 75, 82. I think the judge did say that, if there wasn't a traffic violation, there was no reason to stop him. So I'm trying to figure out when the stop occurred. And I think there's a footnote. There's two footnotes I want to ask you both about. There's, I believe, the state only advanced two possible traffic violations in the trial court. But that's, is that right? That's correct. Okay. And so we have footnote number five, is it? Where the judge says that one didn't happen. Correct. Right. 21955. That's at ER 6 footnote five. That's correct. ER 5, footnote five right there. Yeah. 21955. So the judge then, I think by implication, must be relying on 21950B. Correct, Your Honor. Because there wasn't another one advanced. Is that right? There was not, Your Honor. There was no other basis that was advanced in the district court for the stop. Okay. So we'll hear from the state when we hear from the state about whether that traffic violation occurred. If I think that there wasn't a reasonable suspicion of that traffic violation either, then what? What's the right answer? Well, then there was no reasonable suspicion or probable cause to have stopped Mr. Pennington. It wasn't a trick question. What I mean to be saying, did the state ever argue that Deputy Miller, I didn't ask a good question though, did the state ever argue that Deputy Miller, you know, reasonably or in good faith, believe that there had been a traffic violation? It never advanced that argument in the district court below no, Your Honor. And I think, and that's a real problem here. If it had done that, then Mr. Pennington and the government might have, the record would have been much more fulsome as to the facts that were before the officers at that time. Did they have, did the facts give them a reason to believe that Mr. Pennington had stepped out, you know, 219- So anyway, your position is that they didn't and it's too late. They didn't and it's too late. That's correct, Your Honor. So let me ask you this, please. If the car, if the police car pulled over, meaning to the curb, and I can't find anywhere where it really says that. It never says curb, Your Honor. Okay. So I couldn't find curb. But if it did, I don't know why it did because it was on its way to a different call. So that seems to be a difficult thing to describe or to figure out in the record. But if the car, if the police car stopped to the side of the road, would that be a, you know, quote unquote stop for purposes of our analysis here? The question is whether a reasonable person in Mr. Pennington's position would have felt unfree to leave. And yes, it would have been a stop under that standard. Why? Why? The lights weren't on. The lights weren't flashing. He could have just walked by, right? Your Honor, the current case from this circuit identifies several factors. And it all bears upon what would a reasonable person have understood. The fact that they were uniformed, they had arms, is relevant. Their car was marked as relevant. But also, Mr. Pennington's reaction is a highly relevant factor here. What did he do? Incur it was the same thing. An officer pulled in, not so as to totally block the person, but just so as to make clear that he was targeting a human. But it's not his individual reaction. I always have that way. When I see a blue light in my mirror, I just about have a heart attack. And that's not the, you know, normal people don't. The real answer is, right, we have to look at what a reasonable person would react. And if a police car, if it just pulled, it didn't come screeching up or anything, did it? There was no testimony that it screeched, Your Honor. Right. So it pulls, let's just play this out if we could. If it just pulled over and the officers, as they were getting out, Deputy Miller said, as he was getting out, he saw Mr. Pennington move the gun, right, from his waistband to his pocket. Would that be sufficient then? I, once again, Your Honor, I'm not trying to avoid the question, but I think you have to look at the other factors that, this is a multi-factor analysis. On Kerr, in Kerr, I agree with Your Honor that this is subjective, objective, not subjective to what the individual person thought. But what the individual person did is relevant to the objective analysis. Counsel, let me ask you this. Do we consider, do we consider the circumstances at all? Do we consider the location, a high crime area versus a suburban area? Do we consider the experiences of young African-American men as opposed to those of people who are not young African-American men? Do we resolve that part of the equation as well? I certainly think that this can be part of the equation because it is a holistic inquiry. What would a reasonable person, you know, the testimony was this was a high crime area. Mr. Pennington is a young African-American man. What time of day was it, please? It was, as I understand it, early afternoon. It was daylight. Okay. I'd just like to direct Your Honors back to this Kerr case, so I'd like to just get this out on the record. In that case, there was a person who was in a rural area, not the same type of area, but he was in a rural area. He sees an officer make a U-turn and come pull into his driveway. It was 70 feet away from him. But that person then, on his own, goes up to the officer and says, you know, officer, I don't have a driver's license. This court found what he did relevant. It said, several facts suggest Kerr could reasonably perceive he was the target of this attack. The fact that his disclosure to the deputy, that he had no driver's license, indicates that Kerr felt detained and thus compelled to provide information against his own interests. Is that case in your brief, counsel? I cited it in a 28-J letter. So, yes. That's not exactly what happened here. If we believe Deputy Miller, he stopped his car. We don't know why. I can't figure out why. He stopped his car. He said he was on his way to another call in the neighborhood, firearms-related offense, and, you know, kind of a high-priority call. But he stopped here, right? And then as he was getting out, he saw this gun move from the waistband to the pocket, right? I believe the testimony was he and the other deputy had already gotten out at that point, and they were beginning to approach Mr. Pennington at the time that he saw that. Your position is that the stop occurred when the police car stopped? When the police car stopped and they exited. And they exited. And they exited, and Mr. Pennington saw them exit. Miller's testimony on that here. He makes clear that there's a moment in time between their exit from the car and then when he pulled out the gun. There's a moment where Mr. Pennington... I don't know, but I think he says... Go ahead and just... I think he says that as he was getting out of the car, he sees this furtive movement. Well, once again, I guess just going back to his direct testimony at ER 183. I pulled over the patrol car to make contact with the person walking in the street, who was later identified as Pennington. As the patrol car came to a stop, deputy and I got out of the vehicle, and Pennington appeared startled and caught off guard by our presence. They're out of the vehicle. But now do you think there's a stop? Yes. Because he's startled? Well, because of all of the factors that we talked about. The marked car, the uniforms, their arms, the proximity to Mr. Pennington, and the fact that he was startled. This is relevant. Had they parked farther away, he might not have been startled. Had only one deputy gotten out, he might not... A reasonable person might not understand. I think you're asking us to hold that a reasonable person would feel not free to walk away just because the car stops and the officer gets out. That's close to him. Close enough that he can readily put his hands on the hood. Yes, yes. And it was a pretty narrow street, Your Honor. There are photographs of it at ER 152 to 54. So I think that is relevant. Even if he was in the middle, you know, there's cars parked along the outside. Deputy Miller could have pulled over slightly. There's not a lot of room there. And, I mean, once again, the proximity is such probably just a few feet, if that. Because even an armed suspect, once they even see the gun, at that point they're able to just say, okay, put your hands on the hood of our car. I go back to that fact. That shows they were very close to Mr. Pennington. This was not just one person coming upon a stationary suspect. Also, the fact that Mr. Pennington was in motion prior to the stop is very relevant. The government's cases, Kim and Washington, distinguish between coming up to an individual who's standing or sitting or a car that's parked versus coming up to somebody who's already in motion, like Mr. Pennington was here, and curtailing or somehow impeding that motion. The directionality was 180 degrees here. Officers, Pennington, his forward motion was stopped, and that's also a highly relevant factor here. All of this is within the court's contemplation. The fact that Mr. Pennington was a young African-American man is also a highly relevant factor in this situation. He understood that he was not going to be free to just walk away. Even if he could have turned and walked the other way, this court's cases reject that as a basis for finding no traffic stop. Is it reasonable that if these officers thought that there was a traffic stop, that's what they said, and they thought that Pennington was walking in the street, they pull up to block his continued movement? I think that's what the record showed, and the district court heard this testimony from the deputies, heard Mr. Pennington's testimony, was aware of that. This was the question and did conclude there was a traffic stop at that point, and I think this court should give due deference to that reasonable inference of the district court from that testimony. Yes, Your Honor. Did you want to save the balance of your time for rebuttal? Yes, Your Honor. Thank you. I appreciate it. Thank you. We'll hear from the government. When I said your day was going to get better, I thought you were done. I didn't realize. I thought that was a premonition of what was going to happen. No problem. Good morning again, Your Honor. That's why you still paid the big bucks. There was no implied message there. I understand. I understand. David Ransom Friedman for the United States. May it please the court. I think the court has honed in on the key issue, whether defendant was stopped when the deputies pulled over, and I think the record supports that he wasn't. All the deputies did here in this case was they saw a defendant walking in the street, in the middle of the street with his head down. They pulled over, and that's both in the declaration. Pulled over. That's the question. If they pulled over to the curb, that's one thing, but if they pulled over in the sense of stopping the car, that's a different thing. What's your view of what the record shows? It doesn't mention the curb, that they pulled over to the curb, and the testimony from the defendant is that they pulled in front of him such that to impede his progress. So, what do you think the record shows? I think the record shows they at least moved out of his way. It doesn't mention the curb, so we don't know how far, but they were driving. Where do we look in the record to find out they moved out of his way, counsel? I would look at 2ER98, which was Deputy Miller's testimony, and 2ER183, which was- Well, 183 we've looked at, and it doesn't say that they moved out of his way. Do you think 2ER98 is more helpful? I think it repeats that they pulled over the patrol car, and I think the meaning of- Pulled over doesn't help us. Well, I think if they were walking towards him, and defendants in the middle of the street, if they were driving towards him and defendants walking the other way in the middle of the street, they would have just stopped to block him. If pulling over suggests they at least got out of his way a little bit. Maybe. Perhaps not, but I also, in terms of the distance, the declaration at 2ER184- What if he just stopped? What if he just stopped? First of all, he's on his way to another event, right? Another call? Yes, Your Honor. And I couldn't see anywhere that he came screeching up. In terms of- Quickly. No, I don't think that's correct. And no sirens or anything like that. Not- Sirens were not on. Okay, so I think that's right. I couldn't find anything like that. So let's say he just stopped in his own lane. Presumably he's not driving in the middle of the road, but this individual, he's- I think they both agree. Walking in the middle of the road, and he- Well, they don't both agree. But Deputy Miller says that Mr. Pennington was walking in the middle of the road, and presumably Deputy Miller was driving in his own lane. So he stopped. Yes. And you think at that point, Mr. Pennington, a reasonable person in his shoes, would feel to just keep walking? Yes. What's your response to opposing counsel's argument? You consider the circumstances and the neighborhood, and that he looked startled when he looked up. That is as per Deputy Miller. Yes, that's correct. Miller says, depending to look startled. That he looked startled. I don't think his subjective reaction is relevant. The Supreme Court has made this an objective test, and what the Supreme Court- But we consider all the circumstances in the objective test, right? Yes, Your Honor. Do you think it's important that he was a young, African-American man in a high-crime community? I think the Supreme Court has made an objective statement, a categorical statement, that if the police approach you in public and ask questions, a reasonable person would feel free to walk away. But you are aware of the number of police shootings of African-American men who are fleeing. Are you aware of that? Of course, I'm aware of that. So why wouldn't it be reasonable for a young African-American man not to walk away or not to flee if in the back of his mind he knows that all of these police shootings have occurred? Well, I think, again, we have to really hone in on what happened exactly at the moment when Deputy Miller- Well, we're talking about what's objectively reasonable. Yes. And what's objectively reasonable is based on circumstances. And to me, you're asking me to ignore the fact that it's common knowledge that unarmed African-American men are shot oftentimes by police officers when they're trying to walk away or run away. Well, I think even if the court were to consider that as an objective circumstance of Mr. Pennington's background, we have a case where all the police did was stop their car and get out. They didn't touch their weapons. They didn't say anything. They didn't raise their voices. And in those circumstances, I think a reasonable person would feel free to walk away. Could I ask you on this point? Forgive me for interrupting, but when you say the officers, you're talking plural now. Only Deputy Miller testified, right? That's correct. Where was his partner? Deputy and I was with him in the car. But didn't testify at the hearing? He did not testify. Why not? I'm not aware of that. It's not in the record. I think Deputy Miller was able to give an account of what happened. And he was the one who ultimately observed the gun. So I think his observations were more important in this case. The district court said that the reason for stopping, because I'm trying to figure why they stopped the car in the first place. Yes. And he said the reason for stopping the car, in spite of the fact that they were on the way to this call, this higher priority call, was a traffic violation. Reasonable suspicion of a traffic violation. But there's footnote five where the district court pretty well indicates one of those, of the two that the state offered, wasn't a traffic violation, right? Yes. Is it right that the state offered just one other one? One other option? We did offer another option, 21-950-B. Right. So what if I don't think there was reasonable suspicion of that either? Well, again... Given California case law on point. Again, we think the fact that Deputy Miller saw the gun before defendant was seized would provide reasonable suspicion for everything that followed. But he's got to have a reason to stop the car. And so then I'm left with, it is pretty unusual for us to say, despite what the district court that did the evidentiary ruling, your theory then doesn't leave us with any reason for the deputies to have stopped the car in the first place. Well, and I'm sorry if I'm misunderstanding your question. I just want to be clear about the analysis. If the defendant was not seized when Deputy Miller saw the gun, then he didn't need a reason to stop. I get that. I get that. Yes. But the district court found that there was probable, the reason for the stop, there's probable cause or at least reasonable suspicion to suspect a traffic violation. Yes. And you offered two traffic violations. And my question is, if I don't think that either of those traffic violations occurred and there was not reasonable suspicion that they had, I don't think the state argued good faith error by Deputy Miller. Fair? It's fair to say we did not argue good faith. We did not mention Hyde and V North Carolina in the district court. I agree. But I don't think, and isn't it too late to raise that before our court? I don't think it's too late. It's not a new theory of suppression. It's another argument in favor of our position, which we've had all along. It is a new theory. It's a new theory. I think the way the Supreme Court characterized it in Hine at page 66 was that it's part of the Fourth Amendment analysis of whether there was reasonable suspicion to conduct a stop. It's part of the Fourth Amendment analysis, but it's a new theory under that analysis. Well, even if it's a new theory, and I understand your point that we didn't cite it specifically below, this court can look at the facts. The district court found the facts, and then it can apply them to what happened here. I don't think the defendant has mentioned what else would need to be developed on that record. Right, the district court did find the facts. And so I've kind of tried to go down that path too, and then I get to, so why'd they stop the car? They just stopped the car. What's the evidence in the record of good faith belief? Well, I think this court doesn't need to look. It's not a subjective test. It's not about what Deputy Miller thought in his mind. It's objective. And I think this court can look at the objective facts. And with 21950B. But aren't the objective facts, forgive me for interrupting again, but the objective facts, I think, if we assume that Deputy Miller was credible, is that they were on their way to a different, a call about a firearm offense, right? Yes. In the neighborhood. Isn't it reasonable to, and these young men say they were, that this police car stopped really for no reason in order for them to put their hands on the hood. And are they responding to the call, assuming that these men have firearms? Well, the district court did not credit the defendant's account. Credit Deputy Miller's account. But Deputy Miller doesn't give us any other reason except for this traffic violation. Well, at page 103, I think what he says is that he thought it was a dangerous situation. He saw someone walking towards him head first in the middle of the street. And because of that, he thought there was a violation. Of what? Violation of what? Well, jaywalking. And I understand the district court's footnote on that. But also 21950B, which makes it a traffic violation to leave the curb and make yourself an immediate hazard by walking into traffic. In a residential area? The statute appears to apply to that. If you're walking head first into traffic. There are no facts of that, though. Are we talking about 21950B? Yes. Okay, so there's this case called Span. You're aware of Span? Yes. Right. And it says that this provision is intended to apply to those situations where a pedestrian unexpectedly asserts his right-of-way in an intersection at a time when the vehicle is so close that it's virtually impossible to avoid an accident. This is not that. Well, then it also continues that typical situations include when a pedestrian walks or runs directly in front of a vehicle. Well, he didn't do that. Well, Deputy Miller's testimony that he was walking head first down the street in the middle of the road into his vehicle. Well, sir, the police car either stopped him or it didn't. And you want me to assume that the car pulled over and this pedestrian was not in front of the car. So now I'm confused about, do you think he was in the middle of the road or crossing into Miller's Lane? Because if he's crossing in front of Miller's Lane and Miller stops, then it seems to me to be that he stopped by the police car. I don't think there's any inconsistency. If he sees the defendant walking towards him, at that moment, he has reasonable suspicion of the traffic violation. And then he then pulls over to make contact with him. He has reasonable suspicion of this violation, 950B? 950B, yes. And again, I think even if you assume that the deputy somehow blocked him, they didn't need a reason to stop. They were, he had not been seized at that point. Well, you're making a distinction between seized and stopped, but they need reasonable suspicion for the stop. And that's what the district court said. At the time when the police car halted his progress, he was stopped. And so that's the finding by the district court. And so at that point is when there needs to be reasonable suspicion. So I don't agree. The district court's analysis was a little bit unclear. The district court framed the two questions it had to answer was one, did the deputy see the defendant walking in the middle of the street? And two, did Deputy Miller, and he used the word stop, which is a little bit imprecise in this context. Well, stop is a term of art in Fourth Amendment jurisprudence. Stop means that the person is not free to leave. And that's what the district court determined, that the stop was made. And so at the point of that stop, there had to be reasonable suspicion that a crime was being committed. And the crime that was articulated was the traffic violation. Well, again, if defendant was not seized at the moment, at that moment of the Fourth Amendment, when he saw the gun, then he did not need a reason to stop the car. The police don't need a reason. Wait, wait, wait, the gun. Now you're really confusing me. Because I think it's uncontested that they didn't see the gun until after they stopped the car. Yes. Okay, back up and tell me where you think the stop occurred. Defendant was not seized until after they saw the gun. Again, the police just stopping their car did not seize defendant. If he stopped, though. So when was he stopped? He was stopped after they saw the gun, they told him to put his hands up, or he already had his hands up, but they told him to come over to the car and put his hands on the hood. That's it? That's the stop with the term of art stop? That's the show of force, yes. At the time they saw the gun, again, all they had done was park nearby. They had not touched their weapons. They hadn't turned on their sirens. They hadn't said anything. But that's not what the district court found. Not what the district court found. On page seven, as to the second issue, Miller testified that he saw Pennington move the gun from his waist to his right hand pocket prior to stopping Pennington. The district court found that was true. But opposing counsel is correct, that if you read that order, there are inconsistent statements. By my read, and by the way, as a trial court judge, I know about this 20-20 hindsight stuff. So I have a lot of empathy, but I think it's inconsistent about what was happening there. You think the district court found a stop? So I'm just reading what he found credible on page seven. I understand the conclusion as well, where he did mention a traffic violation. So I agree there seems to be some inconsistency. But the district court did find the facts. It credited Deputy Miller's account. And the question of whether- But you answered Judge Navarro's question, because I interrupted you, and I've done it again. But it was an important question. And you think the stop happened not until they saw the gun? After the gun. That is when they made a show of force. Okay, and do you think that the district- To Judge Ronaldson's point, do you think that's consistent with the district court's findings? I think it's consistent with its statement on the first part of page seven. Okay. And that's how it framed its analysis, that the question was whether- The second question was going to answer was Deputy Miller, did he see the gun before he was stopped? And again, I think that's sort of imprecise, because seizure was probably the right term here. But he found that that was credible. That's what he found, that he saw the gun before he stopped. And even if there's some not total clarity, I think we do have clarity in the facts. The district court credited Deputy Miller's account of the stop. And the question of whether, what point in time there was a Fourth Amendment seizure, that's a question of mixed facts and law that this court can review to NOVO. And this court- But you really are asking us to do the whole thing to NOVO though, right? Because the district court found that the reason was the traffic stop. If we don't think either traffic stop adds- And that's what Deputy Miller said as well. So if there wasn't a traffic violation, you would want us to say, yes, but to NOVO, the police stopped their car. And that's consistent with Deputy Miller. And that's not a seizure, because a reasonable person would be willing to, even though the district court didn't find this, a reasonable person would be willing to keep walking, right? Yes. And then as they got out, or shortly thereafter, then they saw the gun, and then they had what they needed. Yes. So you want a do-over? I don't think it's a do-over. Again, I realized the imprecision, but the district court, that's how it framed its analysis, that it was going to consider whether they saw the gun before the stop. So you ask us to ignore the portion of the district court decision that talks about the stop and the reasonable suspicion being the traffic violation? I just, I don't think the court needs to reach that issue. And whatever it wants to consider, this court does have to analyze when defendant was stopped as a matter of the Fourth Amendment. And I think that's a question this court can't do without considering when the deputies made a show of force that amounts to seizure. And given the Supreme Court's decisions in Bostick and this court's decision in Washington, it's not a seizure for the police to merely park near someone and then approach them. Do you recognize the concept of stop short of a seizure? Do you, you use, to me, you're using this term seizure as the predicate act. Yes. You don't recognize like the stop and frisk situation as opposed to a full blown seizure? If we're just saying colloquially he was stopped and- No, stop as is used in legal parlance. Stop and frisk. So stop in that sense. You're saying that that didn't happen in this case? It didn't happen until after they saw the gun. And because they saw the gun before there was a seizure, the gun provided them a basis through the stop, is what I'm saying. At that point though, if we go to that point, because I've tried to walk down that, then that's not a stop either. That's a, but he's arrested. Yeah, that's a detention. Well, then he's, well, at that point- You think there's probable cause to arrest at that point? There's probable cause to arrest. There's reasonable suspicion to approach him. That's under this court's decision. But he's already been approached. That's the problem with your argument is he had already been approached. He was approached when the police decided to pull, to stop the car. But again, in Bostick and Washington's court said, just approaching someone on a public street, it's not a seizure. That's not, the police can approach you and ask questions. Here, when they saw the gun, they hadn't even asked questions. But they stopped his progress. So that's different than just a regular encounter where, you know, the police happen to be walking the beat or something and you happen to pass by somebody. That's a little different. So I don't want to, I'll just say, I think there's a dispute about whether they stopped his progress. But even if you're correct- Does that boil down to pulling over to the curb or stopping or what pulling over means? I think that's my problem. I think it boils down to that. That is the key phrase here. What does pull over mean? Okay. And, you know, again, I think even if there was blocked, the decision in United States v. Kim, police car blocked a defendant's progress and then approached his car and asked him questions. And again, this court said, that's not a seizure. The police can approach you in public and ask questions. And I think that's our basic position. Got it. All right. Thank you, Counselor. Thank you, Your Honor. Now your day will get better. Rebuttal. Thank you, Your Honor. Just a couple of points. You know, each and every one of the government's cases, the Kim case involves stationary defendants walking up to someone, parked car, person who was sitting there. In Kim also, there was no uniform. The footnote, the court said there was no marked car, no uniform. So those are important distinguishing facts. But more over here, more to the point- Counselor, could you just slow down a little bit? You're talking very fast. She has very little time. I'm sorry. We'll give you whatever time you need. So you don't have to rush. Thank you so much. The district court knew what it was doing. Maybe the district court at one point said, I'm crediting Deputy Miller's testimony. But the question- Well, he did. Well, he did say that. But Deputy Miller is not the person who can determine the legal point at which there was a Fourth Amendment seizure. That was the district court's job. And it understood that that was its task. And it said, I'm crediting Deputy Miller's statement of the historical facts of what happened. But it was where on ER 6, it said, was there a stop before they saw the gun? It understood that that was the Fourth Amendment question. And then it made that determination on ER 7. And it said, no, there wasn't. The stop was based on a traffic violation. And I think the other citations in the record show that it really was conceptualizing it in that way all throughout the hearing and repeatedly saying it was because of a traffic violation. And as Your Honor pointed out, there were only two purported traffic violations that were raised here, 21955, which it rejected and was correct to reject, and 21950B. And I think the other piece of this case that we kind of haven't really touched on yet is that what was Mr. Pennington doing here? He was walking in the middle of the road. Those were the actual words that Deputy Miller said. That was all he was doing. There is more than a century of California case law saying that, walking in the middle of the road. The Cox case, the McNeil case, the Holman case, that is legal conduct. And 21950B, as the Spann Court held, and as even subsequent cases after Spann have said, has a narrow application to a person who steps from a place of safety suddenly into the middle of an oncoming car that's so close as to constitute an immediate hazard. So, you know, the conduct here was conduct that's been recognized for decades by California courts as legal conduct, walking in the middle of a road in a residential area. And the government is kind of trying to shoehorn this conduct into vehicle code sections that don't have any application to it. Right. Assuming that we were to find that there was not a valid traffic stop, and so not a valid reason to stop, and that the police officer here did not provide sufficient information, either by his affidavit or during testimony, for us to determine when exactly the stop occurred, can we look at the testimony of other witnesses? Or did the district court make a credibility determination, decide he didn't believe anything about what the other witnesses said? You know, Your Honor, there was completed testimony here, and I think that's also another part of the argument here. I actually do think that the district court didn't really synthesize the pieces of the evidence in this case in an adequate way. It didn't address some pieces that really did support Mr. Pennington's and Mr. Garcia's testimony, that really all they were doing was just standing next to their car. Well, because he found Mr. Garcia wasn't very observant and hadn't noticed the gun in the first, but he had reasons. Did the district court address that? No, well, the district court addressed... And he also addressed Mr. Pennington's change of story about where the gun came from. So he had reason to discount that testimony. That's correct, Your Honor, but that's not really the test, though in Anderson v. Bessemer City, the question isn't whether the district court had no reason. You know, and in Taylor v. Maddox too, there were reasons. The district court could have considered the additional facts and rejected them and still stuck with its original conclusion about who to credit. But it should have at least addressed and synthesized these stubborn facts in the record, such as the fact that Mr. Pennington, for no other apparent reason but that it was the truth, told the ATF agent that the first thing that that officer said to him when he pulled up was, we're looking for a firearm. We've got a report of a firearm in the area. That supports Mr. Pennington's account. Well, but he had found him not credible, so he didn't have to say anything more about his testimony. So your point is, there's no other way he would have known that. And we get it because we've read your brief. Can I just ask one question? Is he, Mr. Pennington has completed his sentence for this? He has, Your Honor, yes. It's unfortunate. All right, yes. I'm sorry, Mike. I didn't, I don't think I got an answer to my question. So my question was whether or not we could still consider the testimony of the witnesses that the district court found to not be credible. And so I'm thinking of like what I always tell my jurors, you can believe everything a witness says or nothing that a witness says, or you can believe some of what a witness says and disbelieve some of what a witness says. So in this position up here on the bench, can I consider what the witnesses said? Or did the district court already decide that I can consider none of what, you know, the district court made the credibility determination. Did the district court discount everything that the witnesses said? No, Your Honor, I don't think it did. Because at one point, it actually specifically says that under all the witnesses testimony, it's undisputed that Mr. Pennington did have a gun the whole time. The district court did not wholesale discount Mr. Pennington and Mr. Garcia. Even with Mr. Garcia, it was a pretty narrow statement  Just the inconsistency. The inconsistency. So no, I think that to the extent these witnesses kind of gave an account that can be reconciled. Can it be reconciled with Officer Miller? He credited Miller's testimony. So if it's inconsistent with Miller's testimony, the district court did not credit it. I think I think that's correct. But I think, you know, what's what's consistent with Miller's testimony? Well, not inconsistent. You know, Miller's testimony was that Mr. Pennington was walking down the middle of a kind of a narrow street with at least at one point, his head was down, although it doesn't say how long he left his head down. He certainly doesn't say that Mr. Pennington kept his head down until the car pullover. It doesn't say that. He just said at one point, his head was down. Well, maybe Mr. Pennington was, you know, what his story was, is I had my head through the car window listening to some music. Maybe he picked his head out and looked at it. That's inconsistent with Miller's testimony that was credited. Well, I don't know that it necessarily is. It's not the middle of the street. If you have your head in the car window. So those are all kind of, you know, beside the point at this at this juncture. So unless there are any other questions. Thank you to both counsel. The case just argued is submitted for decision by the court that completes our calendar for the day. We will be in recess until 9 30 a.m. tomorrow morning. Thank you, Your Honor. All rise.
judges: RAWLINSON, CHRISTEN, Navarro